STROUD, Judge.
*118 Defendant appeals her convictions for misdemeanor child abuse and contributing to the delinquency of a juvenile. For the following reasons, we conclude that defendant's convictions must be vacated.
I. Background
The facts of this case, as presented by the State, begin simply enough: defendant went to use the bathroom in her home for a few minutes, and her toddler, Mercadiez, tragically managed to fall into their outdoor pool and drown. The complexity of this case arises from the fact that about two years before, defendant was babysitting another child, Sadie Gates, who got out of the house and drowned just outside of her home. Defendant was indicted, tried, and convicted by a jury of misdemeanor child abuse and contributing to the delinquency of a juvenile for Mercadiez's death. Defendant appeals.
II. Defendant's Appeal
Defendant makes three separate arguments on appeal: (1) the trial court erred in denying her motion in limine to exclude the evidence of Sadie's death because it was not an appropriate use of evidence under North Carolina Rule of Evidence 404(b) regarding prior crimes and bad acts and it should have been excluded pursuant to North Carolina Rule of Evidence 403 because the probative value of the evidence did not substantially outweigh the unfair prejudice; (2) the trial court erred in denying defendant's motions to dismiss because there was not substantial evidence of each essential element of the crimes charged; and (3) the State went so far beyond the scope of the appropriate use of the admitted Rule 404(b) evidence in its questioning and arguments to the jury that it amounted to plain error in defendant's trial.
This panel has struggled mightily on this case. While defendant's issues may seem typical for a criminal appeal, unfortunately, an analysis of these issues has turned out to be quite complex, but we have addressed each issue, since we believe that all are interrelated as they appear in this case and all have merit.
III. Motions to Dismiss
Defendant argues that "the trial court erred by denying [her] motions to dismiss all three of the charges at the close of *706 the State's evidence and at the close of all the evidence." (Original in all caps.) The jury found defendant not guilty of involuntary manslaughter, and thus we address only the crimes for which defendant was convicted: misdemeanor child abuse and contributing to the delinquency of a juvenile.
*119 This Court reviews the trial court's denial of a motion to dismiss de novo . On a motion to dismiss for insufficiency of evidence, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor.
State v. Clark , 231 N.C.App. 421, 423, 752 S.E.2d 709, 711 (2013) (citations and quotation marks omitted), disc. review denied , 367 N.C. 322, 755 S.E.2d 619 (2014).
A. Misdemeanor Child Abuse
Turning to defendant's conviction for misdemeanor child abuse, North Carolina General Statute § 14-318.2(a) provides,
Any parent of a child less than 16 years of age, or any other person providing care to or supervision of such child, who inflicts physical injury, or who allows physical injury to be inflicted, or who creates or allows to be created a substantial risk of physical injury, upon or to such child by other than accidental means is guilty of the Class A1 misdemeanor of child abuse.
N.C. Gen. Stat. § 14-318.2(a) (2013). North Carolina General Statute § 14-318.2(a) is awkwardly worded, and it is not immediately clear what the phrase "by other than accidental means" is modifying, but our Supreme Court has clarified that issue: "This statute provides for three separate offenses: If the parent by other than accidental means (1) inflicts physical injury upon the child, (2) allows physical injury to be inflicted upon the child, or (3) creates or allows to be created a substantial risk of physical injury." State v. Fredell , 283 N.C. 242, 244, 195 S.E.2d 300, 302 (1973). In other words,
To convict defendant of misdemeanor child abuse, the State needed to prove only one of the following elements: (1) that the parent nonaccidentally inflicted physical *120 injury on the child; (2) that the parent nonaccidentally allowed physical injury to be inflicted on the child; or (3) that the parent nonaccidentally created or allowed to be created a substantial risk of physical injury on the child.
State v. Armistead , 54 N.C.App. 358, 360, 283 S.E.2d 162, 164 (1981). Furthermore, " G.S. 14-318.2(a), contemplates active, purposeful conduct" on the part of the defendant. State v. Hunter , 48 N.C.App. 656, 660, 270 S.E.2d 120, 122 (1980).
Because this Court is required to consider the evidence "in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor" at this point we would normally turn only to the evidence presented in the State's case in chief to determine whether there was "substantial evidence" of "each essential element of the offense charged[.]" Clark , 231 N.C.App. at 423, 752 S.E.2d at 711. But in this case, defendant presented direct evidence which does not conflict with the State's evidence, and although the charges against defendant should have been dismissed even without consideration of her evidence, in this case, consideration of her evidence is more than appropriate; here, it is required. See generally State v. Bates , 309 N.C. 528, 535, 308 S.E.2d 258, 262-63 (1983) ("[O]n a motion to dismiss, the court must consider the defendant's evidence which explains or clarifies that offered by the State. The court must also consider the defendant's evidence which rebuts the inference of guilt when it is not inconsistent with the State's evidence.").
1. Consideration of Defendant's Evidence
Generally, the defendant's evidence is disregarded when deciding whether the evidence *707 is sufficient to submit the charged offenses to the jury unless that evidence is favorable to the State. See generally State v. Nabors , 365 N.C. 306, 312, 718 S.E.2d 623, 627 (2011) ("The defendant's evidence, unless favorable to the State, is not to be taken into consideration." (citation and quotation marks omitted)). "However, if the defendant's evidence is consistent with the State's evidence, then the defendant's evidence may be used to explain or clarify that offered by the State." Id. (citation and quotation marks omitted). Indeed, our Supreme Court has noted that "[w]e have consistently held that on a motion to dismiss, the court must consider the defendant's evidence which explains or clarifies that offered by the State. The court must also consider the defendant's evidence which rebuts the inference of guilt when it is not inconsistent with the State's evidence." Bates , 309 N.C. at 535, 308 S.E.2d at 262-63. *121 A comparison of the evidence presented by the State and the defendant in Bates is helpful to illustrate how defendant's evidence should be used in this situation. Id. at 529-32, 308 S.E.2d at 260-61. In Bates , the State's evidence was summarized by the Supreme Court as follows:
The State offered evidence tending to show that at around 11:00 p.m. on 6 January 1982, defendant came to the residence of Mrs. Mary Godwin at 307 Kenleigh Road in Fayetteville, North Carolina. Mrs. Godwin testified that defendant appeared to be severely injured and was pleading for help. She stated that defendant's clothing was covered with blood and dirt. A nurse at Cape Fear Valley Hospital, Mrs. Godwin attempted to render first aid assistance to defendant Bates and immediately called an ambulance and the Cumberland County Sheriff's Department.
Deputy John Dean responded to Mrs. Godwin's call. Deputy Everette Scearce arrived shortly thereafter and began to search the area around the Godwin residence. In a field approximately 300 feet from the house, Scearce discovered the body of Roy Lee Warren, Jr., lying beside an automobile. Warren's body was partially covering what appeared to be a lead pipe approximately 18 inches in length. Scearce testified that he remained in the field only a few moments before leaving to call an ambulance for Warren.
Conrad Rensch, a crime scene technician with the City/County Bureau of Investigation, testified that he received a call to come to Kenleigh Road at approximately 12:30 a.m. on 7 January. He immediately proceeded to the field and began his investigation of the crime scene. He observed that there were numerous scuff marks in the dirt surrounding the body and he detected spots of blood on the car.
Items of personal property belonging to both Bates and Warren were discovered in an area near the edge of the field. These items ranged in distance from approximately 73 feet to 116 feet from Warren's body and were generally located within 25 feet of each other. A watch, keys, wallet, checkbook and calculator were identified as the victim's possessions, while a gauze bandage, gold neck chain and jacket were determined to belong to defendant.
*122 Rensch noted that there were scuff marks near several of the items and that the ground was covered with blood in some places.
Rensch also testified that he found a .22 caliber revolver in a grassy area not far from the other items. Douglas Branch, a ballistics expert with the State Bureau of Investigation, stated that in his opinion a bullet recovered from the decedent's body was fired from the revolver discovered in the field. Rensch related that there was a large amount of blood near the gun. He did not see scuff marks in that area, but admitted that it was usually difficult to find them in the grass.
David Hedgecock is a forensic serologist employed by the S.B.I. Crime Laboratory. He testified that after performing laboratory tests upon blood samples removed from Bates and Warren, he determined that defendant's ABO grouping was type B and the deceased's ABO grouping was type O. Hedgecock stated that the blood removed from the car was type B and therefore consistent with defendant's blood type, but that the bloodstains found on the ground and on the various personal items *708 strewn throughout the field were of both type O and B.
The State also presented testimony of Dr. Thomas Bennett, a forensic pathologist. He testified that during the post-mortem examination of the deceased, he located numerous small cuts and abrasions and 32 stab wounds. He further identified two gunshot wounds, one to Warren's right abdomen and another, a grazing wound to the left cheek. Dr. Bennett recovered one bullet from the body in the midline section.
Dr. Bennett testified that in his opinion the gunshot wounds were inflicted at close range, at least within four feet. He further gave his opinion that the gunshot wounds were probably inflicted before the stab wounds.
309 N.C. at 529-31, 308 S.E.2d at 260.
The defendant's evidence was entirely consistent with the State's evidence, but explained what had happened between the defendant and the decedent:
*123 Defendant's evidence, which included his own testimony, tended to show that he and Warren were friends and former co-workers at the Food Town grocery. Defendant Bates testified that a few days prior to 6 January 1982, Warren asked him if he had a gun. Defendant replied that he did not have one, but that his mother did. Defendant asked Warren to meet him in the field on Kenleigh Road and there gave Warren his mother's .22 caliber revolver. Defendant acknowledged that Warren gave him $30.00 for the weapon, although he maintained that he did not ask for any money in exchange for the gun.
Defendant further testified that, on 6 January, he went to the Food Town where Warren worked and asked him to return the pistol because his mother had discovered that it was missing. Warren offered to bring the gun to defendant's home later that evening, but defendant told Warren he would rather meet at the same field on Kenleigh Road so his mother would not see them. Warren agreed and told defendant to watch for him around 7:00 p.m. Defendant stated that he lived near the field and watched for Warren's car from his bedroom window. Warren arrived at the field at around 10:00 p.m. and defendant then walked out to meet him.
Defendant testified that he and the decedent had a disagreement over the gun because Warren refused to return it until defendant gave him $30.00. After Warren consistently refused to relinquish the weapon without payment, defendant said he would have to tell his mother where the gun was. As he rose and turned to get out of the car, defendant testified that Warren stabbed him in the back. Defendant remembered that he stumbled, but after regaining his balance he began to run in the direction of the nearest house. Because defendant had a cast on his leg from a football injury, he did not run to his own home because it was farther away and he was afraid he would not make it.
Defendant testified that Warren fired one or two gunshots and shouted something like, "If you don't stop running, I'll kill you." Defendant stated that he stopped running and Warren caught up with him in the general *124 area where most of the items of personal property were later found. Defendant stated, however, that he did not recall seeing any of the decedent's possessions.
Defendant testified that Warren approached him and hit him across the forehead with the gun. Defendant fell to the ground, Warren jumped on him and they started to fight. Defendant related that at one point during the tussle, he tried to wrestle the gun from the decedent. He testified that the gun went off while he and Warren were fighting on the ground, although he was unaware that a bullet had struck the decedent.
Eventually, defendant was able to break free from Warren and he crawled back toward the car. Defendant testified that he was about to enter the car when Warren grabbed him from behind and pulled him to the ground. Defendant stated that when he opened the door to get into the car, a metal pipe rolled out from the floorboard and onto the ground.
Defendant remembered tussling with Warren beside the car and receiving a second stab wound to the chest. He testified *709 that he pulled the knife from his chest and began to stab the decedent. At some point, Warren fell off of defendant and, shortly thereafter, defendant lost consciousness. He later wakened and made his way to the Godwin residence on Kenleigh Road.
Id. at 531-32, 308 S.E.2d at 260-61.
The jury convicted the defendant in Bates of felony murder and robbery with a firearm. Id. at 533, 308 S.E.2d at 262. The defendant argued on appeal that his motion to dismiss the charge of robbery with a firearm should have been allowed "for insufficiency of the evidence[,]" id. and the Supreme Court agreed and expressly based its determination upon consideration of the "defendant's uncontroverted testimony[.]" Id. at 535, 308 S.E.2d at 262. The Court explained that the
[d]efendant's uncontroverted testimony refutes a conclusion that he forcibly took these items of personal property from the victim with the intent to steal them.
We have consistently held that on a motion to dismiss, the court must consider the defendant's evidence which explains or clarifies that offered by the State. The *125 court must also consider the defendant's evidence which rebuts the inference of guilt when it is not inconsistent with the State's evidence .
Defendant Bates' testimony in its entirety must be characterized as a clarification of the State's testimonial and physical evidence; it in no way contradicted the prosecution's case.
Defendant's testimony and the physical evidence reveal that a brutal fight took place between Bates and Warren. Blood of both defendant and the deceased was found on the items of personal property, on the hood of the automobile and on the ground. Conrad Rensch testified that there were numerous scuff marks in the dirt surrounding the automobile and in other areas in the clearing. It is also important to note that items of personal property belonging to defendant were also scattered throughout the field. Defendant testified that he never saw decedent's possessions nor was he aware of how they came to be strewn around the area.
When defendant's explanatory testimony is considered along with the physical evidence presented by the State, the logical inference is that the decedent lost these items of personal property during the struggle with defendant. There is simply no substantial evidence of a taking by defendant with the intent to permanently deprive Warren of the property. We therefore hold that defendant's motion to dismiss the charge of robbery with a dangerous weapon should have been granted.
We further note that defendant was found not guilty of premediated and deliberated murder. He was convicted of felony murder, premised upon the commission of armed robbery. Because there was insufficient evidence to support the commission of the underlying felony, there is also insufficient evidence to support defendant's conviction of felony murder.
Id. at 535, 308 S.E.2d at 262-63 (emphasis added) (citations omitted).
Under the circumstances of this case, as discussed in more detail herein, defendant's motion to dismiss the misdemeanor child abuse charge could only have been properly denied if there was substantial *126 evidence demonstrating that on 11 May 2013, defendant committed some act or omission that created or allowed to be created a substantial risk of physical injury to Mercadiez. N.C. Gen. Stat. § 14-318.2(a) ; see Clark , 231 N.C.App. at 423, 752 S.E.2d at 711. Here, defendant's evidence is entirely consistent with the State's evidence, and thus must be considered, according to Bates . Bates , 309 N.C. at 535, 308 S.E.2d at 262-63. Defendant's evidence can also be "characterized as a clarification of the State's testimonial and physical evidence; it in no way contradicted the prosecution's case." Id. at 535, 308 S.E.2d at 263.
The State elicited testimony from Sergeant Michael Kellum of the Jacksonville Police Department ("JPD"), who at the time of the incident was a detective with the JPD's criminal investigative division. Sergeant Kellum explained that he was involved in the investigation of Mercadiez's death and that he spoke with defendant about the events leading *710 up to the drowning two days after it had occurred. Sergeant Kellum testified that defendant told him she had been in the bathroom that afternoon for approximately five to ten minutes and that "when she went into the bathroom, she had seen Mercadiez playing on the side concrete porch by the side door, with the other girls, that being [Sarah] and [Sarah's] friends from down the street."[1] Defendant further told Sergeant Kellum that upon leaving the bathroom, she saw Sarah without Mercadiez and asked about Mercadiez's whereabouts. Detective Kellum's testimony regarding the pretrial statements that defendant had made to him was the State's primary evidence concerning the series of events that immediately preceded Mercadiez's drowning. The State did not call as witnesses Mr. Reed or any of the children who were present in the house at the time of the incident.
During defendant's case, Mr. Reed testified at length concerning the events leading up to the drowning, clarifying and elaborating upon the State's evidence. Mr. Reed stated that defendant had asked him, "You got this?" before going to use the bathroom. Mr. Reed explained that he understood defendant's question to mean that she was inquiring as to whether he would supervise the children while she was in the bathroom, and he responded "[Y]es."[2] After defendant had been in the bathroom for "not even a couple minutes[,]" he then heard defendant say, "Can't I [use the bathroom] in peace?"
*127 Mr. Reed testified that at that point he got up, walked towards the bathroom, and on his way, observed that Mercadiez was still sitting with Sarah on the side porch. Mr. Reed took the two other children from the bathroom into their bedroom to watch a video. Mr. Reed then checked on one of the other children, and as he walked back through the hall he passed defendant leaving the bathroom. Defendant saw Sarah and immediately asked, "[W]here is Mercadiez?" Sarah responded that she "had just put her in the house." Defendant looked at Mr. Reed and said "[H]ey, she's with you." When Mr. Reed responded that Mercadiez was not in fact, with him, defendant and Mr. Reed began to search the house and yard and found Mercadiez in the pool.
While the State's case did not emphasize the fact that Mr. Reed was also home with defendant at the time of Mercadiez's drowning, the evidence the State offered did indicate that he was at the house during the relevant period of time. Specifically, Detective Kellum testified that Mr. Reed "came out to reach Mercadiez" from the pool. Furthermore, Mr. Josue Garcia, defendant's neighbor who came to perform CPR, testified on behalf of the State that he "saw Mr. Reed with the little girl in his hands" "frantically yelling[,]" and Mr. Reed told him Mercadiez had been in the water from "a couple of minutes" to "seven minutes."[3] Thus, the State's own evidence implied that Mr. Reed was at home during the relevant time period, although it does not specify his exact location or what he was doing at the relevant time; it in no way indicates he was not present. Therefore, the evidence presented by defendant-in the form of Mr. Reed's testimony-is not in conflict with the evidence offered by the State.
In claiming that defendant's evidence regarding Mr. Reed contradicted the State's case-in-chief, the dissent argues that the State's evidence also referenced the general fact that Mr. Reed was present in the home on the day of Mercadiez's death. Even if this were true, however, if both the State's and defendant's evidence noted his presence in the home, where is the conflict? The only difference between the State's case regarding Mr. Reed's presence and defendant's evidence on this subject is that the State made *711 no effort to ascertain precisely where in the house he was immediately prior to and during the time when defendant left to use the bathroom, whereas defendant's case-in-chief filled in this gap in the State's evidence. Had the State put on evidence placing *128 Mr. Reed at a specific location in the home that was different from the locations described by him during his testimony, then a conflict would exist. However, because the State did not put on such evidence, no such conflict existed.
In lieu of providing actual evidence from defendant's case that contradicts the State's evidence, the dissent relies entirely on the fact that upon coming out of the bathroom, defendant questioned Sarah rather than Mr. Reed as to Mercadiez's whereabouts. We fail to see how this is inconsistent with defendant's evidence. The dissent has failed to show any concrete fact offered during defendant's case in chief that conflicts in any way with the State's evidence.
Had the State offered evidence that Mr. Reed was in a different part of the house during the time period in question or that defendant had not spoken with him before she went into the bathroom, then the dissent would be correct that defendant's evidence showing that Mr. Reed understood he was responsible for watching Mercadiez while defendant was in the bathroom would conflict with the State's evidence, and therefore, be ineligible for consideration in connection with defendant's motion to dismiss at the close of the evidence. See generally Nabors , 365 N.C. at 312, 718 S.E.2d at 627. But because the State offered no evidence at all regarding Mr. Reed, we cannot agree with the dissent's insistence that defendant's evidence confirming his precise whereabouts from the time defendant left to go to the bathroom until the time of Mercadiez's death somehow contradicts the State's evidence.
By choosing not to offer evidence at all from Mr. Reed and to instead essentially restrict its entire case-in-chief to Sergeant Kellum's account of his interview with defendant, the State left the door open for defendant to fill this crucial gap in the events leading to Mercadiez's death by offering testimony from Mr. Reed, which is exactly what defendant did. Given (1) the State's strategic decision to forego calling as a witness the only adult in the house during the relevant time period other than defendant; and (2) the consistency of defendant's evidence with the State's evidence, the dissent has failed to make any coherent argument why Mr. Reed's testimony should be disregarded.
The dissent notes that when defendant left the bathroom and saw Mercadiez's older sister, Sarah, she asked Sarah-rather than Mr. Reed-about Mercadiez's whereabouts. However, when defendant left to go to the bathroom, Mercadiez had, in fact, been playing with her sister-while Mr. Reed was watching her. Thus, the fact that defendant directed *129 her question to Sarah is in no way inconsistent with the State's evidence. Indeed, Mr. Reed's testimony included this same exchange between defendant and Sarah.
The dissent also appears to be arguing that defense counsel was required to cross-examine Sergeant Kellum about Mr. Reed's role in these events. But again, the State chose to rely solely upon Sergeant Kellum and not to call Mr. Reed as a witness. The burden of proof is on the State; the defendant has no burden of proof. See generally State v. Womble , 292 N.C. 455, 459, 233 S.E.2d 534, 537 (1977) ("[N]o burden is placed upon a defendant to prove or disprove any of the elements of the crime[.]"). And as discussed above, our Supreme Court has consistently held that the defendant's evidence may-indeed, must-be considered in connection with a motion to dismiss at the close of all the evidence where it supplements rather than contradicts the State's evidence. See Bates , 309 N.C. at 535, 308 S.E.2d at 262-63. Thus, the fact that defense counsel opted to let the jury hear from Mr. Reed directly on this issue in no way precluded his testimony from being considered in a ruling on the motion to dismiss.
Consistent with the State's evidence, Mr. Reed testified that defendant went to use the bathroom for approximately five to ten minutes and sometime during that period of time, Mercadiez wandered away from the house and drowned in the backyard pool. The State's evidence at trial showed that defendant left Mercadiez for a period of five to ten *712 minutes without defendant's supervision. However, the State did not offer any evidence affirmatively establishing that defendant had failed to secure adult supervision for Mercadiez, but rather only evidence that she herself was not watching Mercadiez. Thus, defendant introduced evidence consistent with that offered by the State; that is, evidence that she was not personally supervising Mercadiez while she was in the bathroom.
Critically, however, defendant's consistent evidence rebutted the inference raised by the State that she had failed to ensure her child was being properly supervised while see went to the bathroom. See generally id. at 535, 308 S.E.2d at 263. ("The court must also consider the defendant's evidence which rebuts the inference of guilt when it is not inconsistent with the State's evidence."). The additional evidence introduced in defendant's case-in-chief through Mr. Reed's testimony, including that: (1) before defendant walked to the bathroom, she confirmed that he would be watching the children, and (2) after defendant had entered the bathroom he left Mercadiez unattended, did not in any way contradict the evidence presented by the State during its case. Defendant's *130 evidence merely clarified where Mr. Reed was in the house and what he was doing during the key events leading up to Mercadiez's death. Consequently, consideration of this evidence is necessary in determining whether defendant's motion to dismiss should have been granted. See id. at 535, 308 S.E.2d at 262 ("We have consistently held that on a motion to dismiss, the court must consider the defendant's evidence which explains or clarifies that offered by the State.").
Turning back to the relevant statute, North Carolina General Statute § 14-318.2(a), while defendant was in the bathroom, her only affirmative act was to say, "Can't I [use the bathroom] in peace?" Defendant did not ask Mr. Reed to do anything, much less request that he stop watching Mercadiez; rather, Mr. Reed unilaterally decided to step in and remove the children from the bathroom while leaving Mercadiez. It cannot be rationally inferred that defendant, simply by making this statement, engaged in conduct that would subject her to criminal liability under North Carolina General Statute § 14-318.2(a). See N.C. Gen. Stat. § 14-318.2(a). Accordingly, defendant's consistent evidence rebutted the inference raised by the State's evidence that she "create[d] or allow[ed] to be created a substantial risk of physical injury[.]" Id.
Thus, after reviewing the State's evidence and defendant's evidence that is not in conflict therewith, we conclude that there was not substantial evidence that defendant "create[d] or allow[ed] to be created a substantial risk of physical injury ... to [Mercadiez] by other than accidental means[.]" Id. Because an essential element was missing from misdemeanor child abuse, see id. the trial court erred in denying her motion to dismiss the charge. See Clark , 231 N.C.App. at 423, 752 S.E.2d at 711. We thus vacate defendant's conviction for misdemeanor child abuse.
2. Consideration of Only the State's Evidence
Although, as discussed above, defendant's motion to dismiss should have been granted upon consideration of both the State's evidence and defendant's evidence, the motion should also have been granted even without consideration of defendant's evidence. The dissent takes the position that defendant's evidence should not have been considered, and that defendant's motion should have been denied. We will therefore address why we believe that even without consideration of defendant's evidence, the trial court still erred in denying defendant's motion to dismiss the charge of misdemeanor child abuse. Even assuming arguendo , that defendant's evidence did contradict the State's evidence and thus should not be considered, see generally Bates , 309 N.C. at 535, 308 S.E.2d at 262, the State still did not present "substantial evidence ... of *131 each essential element of the offense charged[.]" Clark , 231 N.C.App. at 423, 752 S.E.2d at 711.[4] *713 To determine what conduct may fall within the "by other than accidental means" element of North Carolina General Statute § 14-318.2(a), we will examine some cases which have found sufficient purposeful conduct pursuant to North Carolina General Statute § 14-318.2(a). In State v. Fritsch , the Supreme Court determined there was sufficient evidence of misdemeanor child abuse, see 351 N.C. 373, 382, 526 S.E.2d 451, 457 (2000), where "the victim suffered from cerebral palsy and severe mental retardation, functioning at the level of an infant[,]" and
[o]n 4 October 1995 the DSS observed that the victim appeared emaciated; that her arms and legs were in a fetal position; that she looked and smelled bad; that she had crusted dirt between her toes and various folds of her skin; that her left foot was swollen; and that she had pressure sores on her right foot, right ear, back, and the back of her head at the hairline. When questioned about the victim's physical condition, defendant responded that the pressure sores were actually ant bites that had not healed. The DSS then told defendant to take the victim to the doctor for a medical evaluation. On or about 19 October 1995, the victim was treated for an ear and upper respiratory infection ; and the physical examination was rescheduled. However, defendant missed two scheduled appointments to have the victim physically examined. Despite numerous calls and visits to defendant's home and a mailed certified letter requesting contact, the DSS was unable to contact defendant until 18 December 1995. On 19 December 1995 the DSS stressed to defendant that the victim needed a physical evaluation and that she needed to be back at the Center. On 20 December 1995 the DSS substantiated neglect for lack of proper care and lack of proper medical care of the victim by defendant based on *132 observations made at the Center on 4 October 1995 and defendant's continued failure to take the victim to a doctor for a physical examination. The victim died on 1 January 1996 before case workers were scheduled to visit defendant's home.
On 2 January 1996 Dr. John Leonard Almeida, Jr., a pathologist, performed an autopsy of the victim's body. The autopsy revealed that the victim weighed eighteen pounds at her death and that the victim's stomach contained approximately a quart of food. Dr. Almeida opined that the underlying cause of the victim's death was starvation malnutrition.
Id. at 374-76, 526 S.E.2d at 451-54 (quotation marks omitted).
In State v. Church , this Court found substantial uncontroverted evidence of misdemeanor child abuse where
Travis' face was burned while he was under defendant's supervision and no other adults were present.... Competent medical evidence at trial was that Travis' facial burn was well-circumscribed, or perfectly round. The burn looked like the child's face had been immersed in a bowl or cup of liquid. There were not any areas that looked as though there had been dripping, running, or motion. Instead, it appeared that something had been placed or held against the child's face. The medical evidence also included an opinion that Travis suffered from battered child syndrome and an opinion that he had been abused.
99 N.C.App. 647, 654-55, 394 S.E.2d 468, 473 (1990).
In State v. Woods , this Court concluded there was sufficient evidence that "created or allowed to be created a substantial risk of physical injury, upon or to her child by other than accidental means, in violation of the third distinct offense described in G.S. 14-318.2(a)" where the evidence showed the "defendant's husband had repeatedly abused this child during the several weeks prior to 12 October, and that the defendant was aware of this deplorable and dangerous situation but took no effective action to stop or *714 prevent the abuse until 12 October[,]" though defendant was not actually charged with that offense, 70 N.C.App. 584, 587-88, 321 S.E.2d 4, 7 (1984) (brackets omitted). And in State v. Armistead , this Court determined that though some evidence was erroneously admitted there was "ample uncontradicted evidence" that *133 the "defendant intentionally inflicted some physical injury on his child. The force used was at least sufficient to draw blood and leave visible signs of the injury for several days[,]" and thus defendant was properly convicted of misdemeanor child abuse. 54 N.C.App. 358, 359-60, 283 S.E.2d 162, 164 (1981).
In State v. Mapp , this Court determined there was sufficient evidence of misdemeanor child abuse where
[t]he evidence clearly shows that defendant was the mother of the child and the child was less than 16 years of age. Dr. Ronald Kinney, a physician with a specialization in treating abused children, testified for the State. The doctor stated that the deceased child was the victim of the battered child syndrome; that the term meant that the child had suffered nonaccidental injuries; and that the injuries were caused by the child's custodian.
45 N.C.App. 574, 581-82, 264 S.E.2d 348, 354 (1980) (quotation marks omitted).
Church , Woods, Armistead, and Mapp , all involved evidence of the purposeful physical abuse of a child or at least knowing about such abuse and not taking action to prevent or stop it; they have little in common with this case. See Church , 99 N.C.App. at 655, 394 S.E.2d at 473 ; Woods , 70 N.C.App. at 587, 321 S.E.2d at 7 ; Armistead , 54 N.C.App. at 360, 283 S.E.2d at 164 ; Mapp , 45 N.C.App. at 582, 264 S.E.2d at 354. Fristch is also distinguishable because it involved a child dying of "starvation malnutrition" over the course of months of improper care against the advice of DSS. 351 N.C. at 374-76, 526 S.E.2d at 452-54. While the defendant's conduct in Fristch, see id. may not rise to the level of intentionally beating a child, it is certainly a form of purposeful, long-term abuse.
Therefore, this case is most apposite to State v. Watkins , --- N.C.App. ----, 785 S.E.2d 175 (2016). Because Watkins is the only precedential case that bears any similarities to this case, we repeat the facts verbatim:
At approximately 1:30 p.m. on 28 January 2014, Defendant drove with her 19-month-old son, James, to the Madison County Sheriff's Office to leave money for Grady Dockery ("Dockery"), an inmate in the jail. The temperature at the time was 18 degrees, and it was windy with accompanying sleet and snow flurries.
*134 After parking her SUV, Defendant left James buckled into his car seat in the backseat of the vehicle and went into the Sheriff's Office. While inside, Defendant got into an argument with employees in the front lobby. Detective John Clark ("Detective Clark") was familiar with Defendant based on prior complaints that had been made about Defendant letting her toddler run loose in the lobby and into adjacent offices while she visited inmates in the jail. Detective Clark entered the lobby and told Defendant that by order of Chief Deputy Michael Garrison she was not supposed to be on the property and that she needed to leave.
Defendant and Detective Clark argued for several seconds, and then he escorted her to her vehicle in the parking lot. Defendant was inside the building for at least six-and-a-half minutes. Detective Clark testified that from where Defendant was positioned in the lobby she could not see her vehicle, which was parked approximately 46 feet away from the front door.
When Detective Clark was within 10 feet of Defendant's vehicle, he noticed a small child sitting alone in the backseat. Defendant acknowledged that the child was hers. Detective Clark observed that the vehicle was not running and that the driver's side rear window was rolled more than halfway down. He testified that it was very, very cold and windy and the snow was blowing. He stated that snow was blowing onto his head, making him so cold I wanted to get back inside. He noticed that the child, who appeared to be sleeping, had a scarf around his neck. Before walking back into the building, Detective Clark told Defendant *715 to turn on the vehicle and get some heat on that child.
Id. at ----, 785 S.E.2d at 176 (quotation marks omitted).
In Watkins , a jury convicted the defendant of misdemeanor child abuse, and she appealed arguing the trial court should have allowed her motion to dismiss. See id. at ----, 785 S.E.2d at 177. This Court's opinion in Watkins focuses heavily on whether there was a "substantial risk of physical injury[;]" but the ultimate determination was that
[g]iven the harsh weather conditions, James' young age, and the danger of him being abducted (or of physical harm *135 being inflicted upon him) due to the window being open more than halfway, we believe a reasonable juror could have found that Defendant created a substantial risk of physical injury to him by other than accidental means.
Id. at ----, 785 S.E.2d at 178.
While foreseeability is not an element of misdemeanor child abuse, it is difficult to engage in an analysis of when behavior crosses the line from "accident" to "nonaccidental" without consideration of it; furthermore, an "accidental cause" is "not foreseen[.]" Black's Law Dictionary 15 (5th ed. 1979). In Watkins , the defendant was aware of the harsh weather conditions, that the window was rolled down, and that she was leaving her child unattended in a public space; in other words, defendant engaged in the purposeful conduct of leaving her child in the circumstances just enumerated; which is purposeful action that crosses the "accidental" threshold as "physical injury" in this case is very foreseeable, whether by hypothermia or abduction. Id. at ----, 785 S.E.2d at 178. From a commonsense standpoint, most, if not all parents, know there are inherent and likely dangers in leaving a child entirely alone in an open car in freezing weather in a public parking lot.
Turning to this case, the State's evidence never crossed the threshold from "accidental" to "nonaccidental."[5] The known danger here was an outdoor pool. The only purposeful action defendant took, even in the light most favorable to the State, was that defendant went to the bathroom for five to ten minutes. In choosing to go to the restroom, defendant did not leave her child in a circumstance that was likely to create physical injury. This Court in Watkins deemed it to be "a close one," but the actions of the defendant in Watkins are far more active and purposeful in creating the dangerous situation than defendant's actions here. See id. at ----, 785 S.E.2d at 178. If defendant's conduct herein is considered enough to sustain a conviction for misdemeanor child abuse, it seems that any parent who leaves a small child alone in her own home, for even a moment, could be prosecuted if the child is injured during that time, not because the behavior she engaged in was negligent or *136 different from what all other parents typically do, but simply because theirs is the exceedingly rare situation that resulted in a tragic accident.[6] The State did not present substantial evidence that defendant's conduct caused injury to Mercadiez "by other than accidental means[.]" N.C. Gen. Stat. § 14-318.2(a) ; see Clark , 231 N.C.App. at 423, 752 S.E.2d at 711 ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). Therefore, the trial court also erred in failing to allow defendant's motion to dismiss the charge of misdemeanor child *716 abuse even without consideration of defendant's evidence.
B. Contributing to the Delinquency of a Juvenile
Defendant was also convicted of contributing to the delinquency of a juvenile pursuant to North Carolina General Statute § 14-316.1. North Carolina General Statute § 14-316.1 provides:
Any person who is at least 16 years old who knowingly or willfully causes, encourages, or aids any juvenile within the jurisdiction of the court to be in a place or condition, or to commit an act whereby the juvenile could be adjudicated delinquent, undisciplined, abused, or neglected as defined by G.S. 7B-101 and G.S. 7B-1501 shall be guilty[.]
N.C. Gen. Stat. § 14-316.1 (2013). Based on the facts of this case, the jury was instructed only on the issue of neglect. North Carolina General Statute § 7B-101 defines a "[n]eglected juvenile" as one "who does not receive proper care, supervision, or discipline from the juvenile's parent[.]" N.C. Gen. Stat. § 7B-101(15) (2013).
Thus, North Carolina General Statute § 14-316.1
requires two different standards of proof. First, the State must show, beyond a reasonable doubt, that Defendant knowingly or willfully caused, encouraged, or aided the juvenile to be in a place or condition whereby the juvenile could be adjudicated neglected. Second, adjudication of neglect requires the State to show, by clear and convincing evidence, that a juvenile is neglected.
*137 State v. Stevens , 228 N.C.App. 352, 356, 745 S.E.2d 64, 67, disc. review denied , 367 N.C. 256, 749 S.E.2d 886 (2013). Thus, we must consider whether defendant "knowingly or willfully cause[d], encourage[d], or aid[ed the] juvenile ... to be in a place or condition, or to commit an act whereby the juvenile could be adjudicated[,]" N.C. Gen. Stat. § 14-316.1, neglected, and under these facts the neglect alleged was that Mercadiez did "not receive proper care, supervision, or discipline from the juvenile's parent[.]" N.C. Gen. Stat. § 7B-101(15).
The flaw in the State's case is that defendant was not the only "parent" involved. Id. Essentially, the State's theory at trial was that it did not matter that Mr. Reed was present; in other words, the State's theory hinges on the theory that fathers are per se incompetent to care for young children. However, Mr. Reed was a "parent[,]" and thus he had an equal duty to supervise and care for Mercadiez. Id. The evidence does not show that defendant "knowingly or willfully" left Mercadiez "in a place or condition[,]" N.C. Gen. Stat. § 14-316.1, where she would "not receive proper care [or] supervision" from a "parent[.]" N.C. Gen. Stat. § 7B-101(15). There is no evidence that defendant reasonably should have known that Mr. Reed was in any way incompetent to supervise Mercadiez when she went to the bathroom.
Furthermore and once again, even assuming arguendo that defendant's direct evidence of Mr. Reed's express agreement to watch Mercadiez while defendant went to the bathroom should not be considered, the State's evidence alone supports an inference that Mr. Reed was present and competent during the relevant time periods, and thus the evidence still does not show that defendant "knowingly or willfully" left Mercadiez "in a place or condition[,]" N.C. Gen. Stat. § 14-316.1, where she would "not receive proper care [or] supervision" from a "parent[.]" N.C. Gen. Stat. § 7B-101(15). Therefore, defendant's motion to dismiss should have been granted. See generally Clark , 231 N.C.App. at 423, 752 S.E.2d at 711.
IV. Misuse of 404(b) Evidence
Although we have already determined that defendant's motions to dismiss should have been granted, either with or without consideration of defendant's evidence, there are two other issues which defendant has raised on appeal and which are addressed by the dissent: (1) the trial court erred in denying defendant's motion in limine to exclude the evidence of Sadie's death because it was not an appropriate use of evidence under North Carolina Rule of Evidence 404(b) regarding prior crimes and bad acts and it should have been excluded pursuant to North Carolina Rule of Evidence 403 because the *717 probative value of *138 the evidence did not substantially outweigh the unfair prejudice, and (2) the State went so far beyond the scope of the allowed purposes of the admitted 404(b) evidence in its arguments to the jury that it amounted to plain error in defendant's trial. Considering the extent of the evidence regarding Sadie Gates's death and the use of the evidence, we believe we should address these issues as well. As noted below, evidence of Sadie's death was stressed as much or more than that of Mercadiez, and thus without substantive consideration of that evidence by the jury, it is difficult to understand how the defendant was convicted. For the reasons stated below, even if defendant did not prevail on the motions to dismiss, she would be entitled to a new trial based on the misuse of the evidence of Sadie's death by the State.
Before her trial began, defendant filed a motion to exclude the evidence regarding the death of Sadie. The State argued that the evidence was proper under North Carolina Rule of Evidence Rule 404(b). Rule 404(b) allows for the admission of prior "crimes, wrongs, or acts" to show "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C. Gen. Stat. § 8C-1, Rule 404(b) (2013). Ultimately, the trial court found in its order that the evidence of Sadie's death could be used solely as evidence under Rule 404(b) because
[t]here are sufficient similarities between the two events [Sadie's and Mercadiez's deaths] to support the State's contention that the former incident is evidence that shows (1) knowledge on the part of the defendant of the dangers and possible consequences of failing to supervise a young child who has access to or is exposed to bodies of water; (2) absence of accident ; and (3) explains the context of her statements at the scene and later to law enforcement.
(Emphasis added).
[W]hen analyzing rulings applying Rules 404(b) and 403, we conduct distinct inquiries with different standards of review. When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, as it did here, we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion.
*139 State v. Beckelheimer , 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012). The three reasons enumerated by the trial court are proper reasons to allow in the evidence of Sadie's death pursuant to the plain language of Rule 404(b).[7] See N.C. Gen. Stat. § 8C-1, Rule 404(b).
As to North Carolina Rule of Evidence 403, this rule precludes evidence unless "its probative value is substantially outweighed by the danger of unfair prejudice[.]" N.C. Gen. Stat. § 8C-1, Rule 403 (2013). " 'Unfair prejudice' within its context [of Rule 403 ] means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one."
*718 N.C. Gen. Stat. § 8C-1, Rule 403 Commentary (2013). It is difficult to fathom evidence more likely to lead to an emotional decision than the death of a child; however, though this Court under de novo review may have come to an alternate conclusion, as our review is abuse of discretion, see Beckelheimer , 366 N.C. at 130, 726 S.E.2d at 159, we cannot say that "the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." Chicora Country Club, Inc. v. Town of Erwin , 128 N.C.App. 101, 109, 493 S.E.2d 797, 802 (1997) (citation and quotation marks omitted). Therefore, the trial court did not err in allowing in the evidence regarding Sadie's death.
But that does not end our analysis. Defendant also argues that the State went so far beyond the scope of the proper use of the admitted 404(b) evidence in its arguments to the jury that it amounted to plain error in defendant's trial. Because defendant's argument hinges on the admission of evidence during the trial, it is appropriate for plain error review. See State v. Wolfe , 157 N.C.App. 22, 33, 577 S.E.2d 655, 663 *140 ("[T]he plain error doctrine is limited to errors in jury instructions and the admission of evidence."), appeal dismissed and disc. review denied , 357 N.C. 255, 583 S.E.2d 289 (2003).
For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.
State v. Sessoms , 226 N.C.App. 381, 382, 741 S.E.2d 449, 451 (2013) (citation omitted).
After a thorough review of the transcript, we believe that the State used the evidence of Sadie's death far beyond the bounds allowed by the trial court's order. By our count, the State mentioned Sadie to the jury by name 12 times in its opening; by comparison, Mercadiez, the actual child this case was about, was mentioned 15. Even more concerning, during the State's direct examination Mercadiez is mentioned 33 times, while Sadie is mentioned 28.[8] Lastly, during closing, the State mentions Mercadiez 15 times to the jury and Sadie 12 times, with the State asserting that the "bottom line" hinged on Sadie:
So the bottom line is this. It does not matter how she got into the pool. She got into the pool and drowned, and the defendant, Amanda Reed, was not watching her. She failed to supervise her and ensure her safety. She failed to supervise her daughter, just like she failed to supervise Sadie Gates.
(Emphasis added.)
Turning solely to the legal questions before us, here, the State mentioned Sadie Gates almost as many times to the jury as the child who had actually died in this case. While Mercadiez was often being discussed by pronouns-as was Sadie, for that matter-and we have not counted those, it is clear what the jury must have gathered from hearing Sadie's *141 name more than 52 times, as compared to 63 for Mercadiez, only to finally be left with Sadie's tragic death as their "bottom line[.]" The State's use of the evidence regarding Sadie went far beyond showing that defendant was aware of the dangers of water to small children or any other proper purpose as found by the trial court. This case is the "exceptional case" where "a fundamental error occurred at trial" establishing "prejudice that, after examination of the entire record ... had a probable impact on the jury's finding that the defendant was guilty" and "seriously affect[ed] the fairness" of this case. Id. Therefore, on this issue, defendant would be entitled to a new trial, but as noted above, we have reversed defendant's convictions based upon her motions to dismiss. *719 We are not, as the dissent suggests, relying solely upon the number of references to Sadie, nor are we taking a single statement out of context. The State repeatedly suggested that the jury rely improperly upon Sadie's death to find defendant guilty. Here are some other examples:
Had the defendant not been responsible for Sadie Gates's death, had she not been warned of the dangers of leaving a child unsupervised by Julie Dorn, then you would not be sitting here today, deciding this case. Will Reed can come in here and try to take the blame, and they can try to put it on a sibling. They can talk about how good a parent Amanda Reed is, and they can show all the appropriate emotions and responses for a parent that has lost a child, but she cannot avoid responsibility any longer. She cannot continue to shift the blame. It did happen again. Another child left under her care and her supervision, another child that drowned and died.
....
... Two children, two, under her care, left unsupervised by her, who got out of the house and into the water and drowned. Her inactions, her lack of supervision, without question, demonstrate a grossly negligent omission. Sadie Lavina Gates, born 2/23/2009. Date of death: 9/27/2010. Cause of death: drowning. Place of injury: pond. Location: 3390 Burgaw Highway. Sadie Gates.
Mercadiez Kohlinda Reed, born 9/14/2011. Date of death: 5/11/2013. Cause of death: drowning. Place of injury: residence. Location: 313 Forest Grove Avenue, Jacksonville.
....
*142 ... Two children, the same age, both girls, left unsupervised, out of the house, drowned in water. You know what the common denominator is that everyone has overlooked, what's not on either one of those death certificates right there in front of you? What's the common denominator? Her. Amanda Reed is the common denominator. She is the one. And just as she was responsible for the death of Sadie Gates, so, too, is she responsible for the death of Mercadiez Reed. Not a sibling, not Will Reed, but her. She is the person that can and should be held criminally responsible for her daughter's death, because she is the only person who knew of the dangers, who had been negligent before, and who acted in a grossly negligent manner.
....
In the beginning, I told you there were six questions: who? What? Where? When? How and why? I want to talk about the one question [defendant's counsel] didn't talk about. Why. Isn't that what the case is all about? Why? You know why. You know why. Sadie Gates's death was caused by the defendant's lack of supervision and care. Mercadiez Reed's death was caused by the same lack of supervision and care.
(Emphasis added.)
We have considered the totality of the evidence and arguments, and the specter of Sadie's death permeated the entirety of the State's case-in-chief. Although some portions of the State's argument were, as noted by the dissent, within the proper scope of use of the evidence, others, as we have cited above, were not. By referencing only the portions of the State's argument that stayed within the Rule 404(b) bounds, the dissent takes the use of the evidence out of context. Considering the argument as a whole, the prosecution clearly used the evidence of Sadie's death far beyond the purposes for which the trial court admitted the evidence and essentially argued that defendant has a propensity to leave two-year-old girls unattended, resulting in death by drowning; this is the use forbidden by Rule 404(b). See N.C. Gen. Stat. § 8C-1, Rule 404(b).
V. Conclusion
In certain cases, "we must bear in mind Lord Campbell's caution: 'Hard cases must not make bad law.' " Hackos v. Goodman, Allen & Filetti, PLLC , 228 N.C.App. 33, 43, 745 S.E.2d 336, 343 (2013) (citation *143 and quotation marks omitted). Here, the death of Mercadiez was tragic, as was Sadie's death, but the law does not support the charges against defendant with an appropriate consideration of the actual evidence in this case. The trial court erred in denying defendant's *720 motion to dismiss both charges, and defendant's convictions are vacated.
VACATED.
Judge DAVIS concurs with separate opinion.
Judge STEPHENS dissents.

Pseudonyms will be used to protect the identity of the other minors involved.

Mr. Reed also testified that he had been on active duty in the United States Marine Corps for the past 18 years and was attending college to become a social worker. No evidence was offered suggesting that Mr. Reed was in any way an unsuitable caretaker.

The State also stated in its opening statement that the jury would "hear that Will Reed, the defendant's husband, the father of this child, was also in the home at the time that Mercadiez got into the pool and drowned."

We note that the dissent fails to address an element of each of the crimes at issue. As to North Carolina General Statute § 14-318.2(a) it fails to address that the act must be "by other than accidental means[.]" N.C. Gen. Stat. § 14-318.2(a). As to North Carolina General Statute § 14-316.1, it includes only the first portion of the definition of neglect under North Carolina General Statute § 7B-101(15) : "does not receive proper care, supervision, or discipline.... " N.C. Gen. Stat. § 7B-101(15). It omits the final phrase "from the juvenile's parent[.]" The dissent concedes that Mr. Reed was present at the house during the relevant time period but still considers his presence to be irrelevant.

The statistics cited by the dissent come from the CDC's statistics labelled as "Unintentional Drowning" and certainly they are disturbing; yet they are irrelevant to this case. (Emphasis added). These "Unintentional Drownings" arise in many different types of situations, including some with supervision by parents, lifeguards, or others. Most importantly, most "unintentional drownings" would likely also be described as "accidental drownings," and the issue here is whether the acts were "by other than accidental means." N.C. Gen. Stat. § 7B-101(15) (emphasis added).

We agree with the dissent that the State's theory was that defendant , and only defendant, failed to personally supervise Mercadiez, but the State failed to address one element of the crime, since it failed to show that defendant also left Mercadiez without supervision from her other parent to prove neglect under North Carolina General Statute § 7B-101(15). See N.C. Gen. Stat. § 7B-101(15).

While the jury instructions in this case were not raised as an issue on appeal, we will briefly note the conflict within these instructions. In accordance with the Rule 404(b) order, the jury was instructed they could not use the evidence regarding Sadie as substantive evidence, but that they could use it for evidence of "absence of accident[.]" While the trial court did not err in the traditional sense by instructing the jury pursuant to the language of Rule 404(b), in this particular case the language of Rule 404(b) mirrored the element of misdemeanor child abuse which was most highly contested-"by other than accidental means"-which was an element the jury must find to convict defendant of misdemeanor child abuse. N.C. Gen. Stat. § 14-318.2(a). Thus the instructions told the jury that they could use the evidence of Sadie's death to show "absence of accident[,]" but the jury was also instructed that the evidence could not be used for the elements which included "by other than accidental means[.]" Id. The confusion arises because typically, the 404(b) evidence is used to show that the defendant acted intentionally, but here, the State was not seeking to show that defendant intentionally killed Mercadiez. There is no way that the jury could have understood this fine legal distinction between "absence of accident" and "by other than accidental means." Id. But the jury instructions were not raised or argued as an issue on appeal so we do not address it, other than noting how it compounded the problems with the use of the evidence of Sadie's death.

If we include all references in questioning or testimony during the State's case in chief by both the State and defendant rebutting the State's inferences, Sadie was mentioned 32 times and Mercadiez 45 times.